# United States Court of Appeals
## For the First Circuit

---

No. 13-2348

AJC INTERNATIONAL, INC.; AJC LOGISTICS, LLC,

Plaintiffs, Appellants,

UNDERWRITERS LLOYDS OF LONDON

Plaintiff,

v.

TRIPLE-S PROPIEDAD

Defendant, Appellee,

ECONOMY INTERNATIONAL SERVICES, INC.;
MANUEL ESPINOSA-CASANOVA, d/b/a Economy International Services,
Inc.; JOHN DOE; JANE DOE; INSURANCE COMPANIES X, Y, Z,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Thompson, Lipez, and Barron,
Circuit Judges.

---

Manolo T. Rodríguez-Bird, with whom Jiménez Graffam & Lausell
was on brief, for appellants.
William A. Schneider, with whom Morrison Mahoney LLP was on
brief, for appellee.

June 12, 2015

**THOMPSON, Circuit Judge**.  This is an insurance case grounded on diversity.  The parties agree that the policy in question provides coverage for a particular loss of perishable foodstuffs.  So that's the easy part.  What the parties need us to decide is exactly how much coverage there is -- $500,000 or $25,000?  For the reasons below, we agree with the district court's answer:  $25,000.

## I.  BACKGROUND

The underlying facts are undisputed and not particularly numerous.  Based in Puerto Rico, Economy International Systems, Inc. ("Economy") provides cold-storage for its clients' food products until they are ready for distribution to customers.

During the summer of 2010, Economy was keeping more than a million dollars worth of foodstuffs -- things like seafood, beef, and chicken -- on ice for appellants AJC International, Inc. and AJC Logistics, LLC.[1]  Unfortunately, the walk-in freezers in which AJC's products were stored malfunctioned on a few different days, and the problem didn't come to light until Economy noticed the temperature in its freezers was off.  Economy discovered a strong odor emanating from product boxes, a pretty clear indication that the food inside had gone bad.

_____

[1]  The parties do not distinguish between these two corporations.  And neither do we, especially as it makes no difference to the outcome.  From now on, we'll just call them, collectively, "AJC."

The United States Department of Agriculture stepped in and ordered the destruction of the beef and chicken products. AJC worked with the U.S. Food and Drug Administration to come up with any way to salvage the seafood, but it, too, ended up being tossed.

Having suffered a loss in excess of one million dollars, AJC sought recovery under Economy's insurance policy issued by appellee Triple-S Propiedad, Inc. ("Triple-S"). The parties agree that the nature of the loss was in the manner of food spoilage, and that the spoilage was caused by a mechanical breakdown of Economy's freezers. And they both agree that the Triple-S policy provides coverage for AJC's loss as "personal property of others." Though they agree on this much, the parties couldn't reach an accord as to the amount of coverage -- AJC believes it is entitled to $500,000, while Triple-S says the most AJC can get out of it is $25,000.

Invoking diversity jurisdiction, AJC filed suit against Triple-S in the district court and sought a ruling that it may recover $500,000 under the policy.[2] Each side moved for summary judgment, asserting no trial was needed to answer this contract interpretation coverage question.

The motions were referred to a magistrate judge, who issued a detailed report and recommendation. The magistrate judge found the Policy's terms clear and unambiguous and concluded that

_____

[2] AJC also sued Economy in the district court, but it never answered the complaint and was ultimately defaulted. Economy is not a party to this appeal.

-4-

language in the Policy's coverage for losses caused by equipment breakdown limited AJC's recovery to $25,000. Accordingly, the magistrate judge recommended that Triple-S's motion be granted and AJC's denied. The district judge adopted the magistrate judge's findings and recommendations in full, denied AJC's motion for summary judgment, and granted Triple-S's. Unsatisfied, AJC appealed.

## II. DISCUSSION

### A. Standard of Review

Cross-motions for summary judgment require the district court to "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2013) (citing Merchs. Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998)). But see P.R. Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 133 (1st Cir. 2010) (noting that when "cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time," but if it "opts to consider them at different times, it must at the very least apply the same standards to each").

Our review is de novo. Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558 (1st Cir. 2010). We follow the familiar summary judgment rules and affirm summary judgment "only

if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted). "[W]e are not straitjacketed by the [district] judge's reasoning -- quite the contrary, we are free to uphold [the court's] order on any basis present in the record." Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 247 (1st Cir. 2013).

## B. Applicable Law and Policy Language

The parties do not dispute that Puerto Rico law applies in this diversity case. And quite rightly so. See EnergyNorth Natural Gas, Inc. v. Century Indem. Co., 452 F.3d 44, 47-48 (1st Cir. 2006). Before getting into the specific Policy language bearing on our analysis and the parties' arguments about how it applies to the undisputed facts, it is helpful to talk about a few basic principles of Puerto Rico insurance law.

### i. General Principles of Construction

Under Puerto Rico's Insurance Code, P.R Laws Ann., tit. 26, § 101, et seq., "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." Id. § 1125. As the Puerto Rico Supreme Court has explained

-6-

> [w]ith regard to the interpretation of insurance contracts, . . . these "should be generally understood within their most common and usual meaning, not paying much attention to grammatical rigour, but to the general use and popular meaning of the idioms. The insured who acquires a policy is entitled to rely on the coverage offered to him when reading its clauses in the light of the popular meaning of the words used therein."

Pagán Caraballo v. Silva Delgado, 22 P.R. Offic. Trans. 96, 101 (1988) (quoting Morales Garay v. Roldán Coss, 10 P.R. Offic. Trans. 909, 916 (1981)). "[E]xclusionary clauses are not favored, [and] should be strictly construed and in such a way that the policy's purpose of protecting the insured is met." Id.

Any ambiguities in the policy language "shall be resolved in favor of the insured." Id. This is because "[t]he interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity." Meléndez Piñero v. Levitt & Sons of P.R., Inc., 129 P.R. Dec. 521, 546 (1991). Further, when a Puerto Rico insurance contract is ambiguous, "the insurance policy stipulations are construed strongly against the insurer and liberally in favor of the insured." Id. at 547; see also Quiñones López v. Manzano Pozas, 141 P.R. Dec. 139, 155 (1996) ("[N]ice constructions that would allow insurers to dodge liability are not favored.").

On the other hand, Puerto Rico law does "not compel constructions in favor of the insured when a clause favors the insurer, and its meaning and scope is [sic] clear and unambiguous."

Quiñones López, 141 P.R. Dec. at 155 (citing cases); cf. Littlefield v. Acadia Ins. Co., 392 F.3d 1, 8 (1st Cir. 2004) (applying New Hampshire law and observing that "we may not find a term ambiguous merely because it eliminates coverage"). "In such cases, it [i.e., the unambiguous clause] should be held as binding on the insured." Quiñones López, 141 P.R. Dec. at 155; see also Nieves v. Intercontinental Life Ins. Co. of P.R., 964 F.2d 60, 63 (1st Cir. 1992) ("If the wording of the contract is explicit and its language is clear, its terms and conditions are binding on the parties." (citing cases)).[3]

## ii. Policy Language

To set the stage for the rest of our discussion, we begin with a run-down of the Policy language relevant to this appeal.

First, the very basics. The Policy defines the words "you" and "your" to mean the "Named Insured shown in the

---

[3] We note there is some authority for the proposition that Puerto Rico's rules of construction may be relaxed and applied more even-handedly in a commercial setting, where the insured can be expected to have knowledge of the particular subject matter of the policy beyond that of an ordinary individual. See Meléndez Piñero, 129 P.R. Dec. at 548-49 (recognizing that while the wording of a particular commercial general liability policy "may be too technical and sophisticated for the average person who buys a policy," a principal of the insured construction company "would construe such terms as would a specialized average businessman with vast experience in the construction field," and rejecting the notion that "a construction company thoroughly familiar with urban development projects would think that when it buys liability insurance it is actually buying property insurance, a performance bond or a warranty of goods and services"). The parties do not make any arguments along these lines, though.

Declarations."  Turning to those Declarations, we see the Named

Insured is "Manuel Espinosa DBA Economy International Services."

Thus, when reading the Policy, "you" and "your" mean Economy, and

only Economy.[4]  Similarly, the terms "'we,' 'us' and 'our' refer to

the Company providing this insurance," Triple-S.

This case deals with a claim of loss to AJC's property

while it was stored in Economy's freezers.  The Policy includes

"Personal Property of Others" as a category of "Covered Property."

More specifically (and excising language not germane to our

analysis) Triple-S agreed to cover such property as follows:

**A. COVERAGE**

We will pay for direct physical loss of or
damage to Covered Property . . . caused by or
resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage
Part, means the following types of property
for which a Limit of Insurance is shown in the
Declarations:

. . .

**c.  Personal Property of Others**
that is:

**(1)** In your care, custody or
control; . . .

However, our payment for loss of
or damage to personal property
of others will only be for the

---

[4] AJC concedes it is neither a named nor additional insured.

-9-

> account of the owner of the property.

Per the Declarations, the limit of coverage for "Personal Property of Others" is $500,000.[5]

The Policy goes on, though, to exclude certain causes of loss from coverage. Excluded from coverage -- meaning that Triple-S "will not pay for loss or damage caused directly or indirectly" by a particular cause -- is any "loss or damage caused by or resulting from . . . [m]echanical breakdown." From now on, we'll call this the "Mechanical Breakdown Exclusion."

But because Economy wanted the Policy to cover losses caused by mechanical breakdown, it sought, and Triple-S added, an endorsement which specifically provided "Equipment Breakdown Coverage." The resulting Equipment Breakdown Endorsement, as relevant here, provides:

---

[5] The Declarations also reflect a separate "Spoilage Coverage" with a $50,000 limit, but this coverage is limited to spoilage caused by a "power outage." The parties agree that this coverage does not apply, as the spoilage in this case was caused by mechanical breakdown and not a power outage. So, we don't have to worry about that provision here.

-10-

**A.** The Building and Personal Property Coverage Form is modified as follows:

Additional Coverages

The following is added to 4. Additional Coverages:

**Equipment Breakdown**

(1) We will pay for loss caused by or resulting from an "accident" to "covered equipment." As used in this Additional Coverage, an "accident" means direct physical loss as follows:

   (a) mechanical breakdown . . .

(2) Unless otherwise shown in a Schedule, the following coverages also apply to loss caused by or resulting from an "accident" to "covered equipment". These coverages do not provide additional amounts of insurance.

. . .

   (c) Spoilage

      (i) We will pay for your loss of "perishable goods" due to spoilage.

      . . .

The most we will pay for loss or damage under this [Spoilage] coverage is $25,000 unless otherwise shown in a Schedule.

To keeps things clear, from now on we'll call the coverage for

spoilage of perishable goods added by this Endorsement "Spoilage

Coverage." We'll also refer to the $25,000 limit referenced at the end of the Spoilage Coverage the "Spoilage Sublimit."[6]

The added Endorsement provides its own exclusions:

**B.** The Causes of Loss-- Basic Form, Broad Form or Special Form is modified as follows:

**Exclusions**

(1) All exclusions and limitations apply except:

(a) In the Causes of Loss-- Special Form:

(i) Exclusions B.2.a, B.2.d.(6) and B.2.e.

One of the referenced, now-inapplicable exclusions to Equipment Breakdown Coverage is Exclusion B.2.d.(6) -- the Mechanical Breakdown Exclusion.

The Endorsement sets forth other, new exclusions to its specific Equipment Breakdown Coverage that are not found in the main body of the Policy. For example, things such as structures, foundations, insulating material, sprinkler piping, and sewer piping are not "covered equipment." Also excluded is any "damage caused by or resulting from" Economy's "failure to use all reasonable means to protect the 'perishable goods' from damage

---

[6] The Equipment Breakdown Endorsement defines several terms used therein, including "accident," "covered equipment," and "perishable goods." We don't need to worry about these definitions, though, because the parties do not dispute that Economy's freezers constituted "covered equipment" or that AJC suffered a loss of "perishable goods" as a result of an "accident."

following an 'accident,'" along with damage caused by or resulting from "any defect, virus, loss of data or other situation within 'media.'" Additionally, the Endorsement modifies some of the exclusions found in the Policy's main body by adding or subtracting language.

This run-down is sufficient to get the lay of the land. Other relevant provisions will be identified and discussed as needed below.

## C. Coverage Analysis

### i. Framing the Issues

Now for the parties' arguments on appeal. In pursuit of its coverage claim, AJC does not take the position that the Policy is ambiguous. Instead, it relies on the Policy's plain language to say that the Equipment Breakdown Endorsement deleted the Mechanical Breakdown Exclusion found in the original Policy. It pins this argument on Section B.1(a)(i) of the Equipment Breakdown Endorsement, which states that "[a]ll exclusions and limitations apply except" for certain specifically-enumerated ones -- including the Mechanical Breakdown Exclusion -- listed immediately after. AJC urges us to find that this contractual language deletes those exclusions from the original Policy. And with the exclusion deleted, AJC reasons, coverage is then found in the Policy's main body (the Personal Property of Others provisions), not the

Endorsement.[7] AJC goes on to say that this means the $500,000 coverage limit for Personal Property of Others (which is set forth in the Declarations) is available to satisfy its claims.[8]

Not surprisingly, Triple-S disagrees with AJC, telling us that the "clear and unambiguous terms of the Triple-S Policy provide a $25,000 sub-limit for spoilage of 'perishable goods' caused by or resulting from equipment breakdown." Appellee Br. at 18. Thanks to the Policy's exclusion of losses caused by mechanical breakdown (as happened here), Triple-S says, instead of $500,000 being available for loss to the Personal Property of Others, $0 is. In other words, the main body of the Policy provides no coverage for AJC's loss. But, Triple-S explains, the Equipment Breakdown Endorsement added coverage for losses stemming from equipment breakdown back to the Policy, including situations

---

[7] As AJC puts it, coverage is "pursuant to Section A. of the Building and Personal Property Coverage Form." Appellant Br. at 20.

[8] AJC further posits that, "[i]f, in fact, the $500,000.00 coverage limit in the Triple-S Policy is not available for a loss caused by or resulting from a mechanical breakdown of frozen food products owned by a client of the insured (Economy), then this coverage limit is illusory." Appellant Br. at 22. While the Court is familiar with the concept of illusory coverage, AJC does not explain what it means by an illusory coverage limit. And even if we presume that what AJC actually means to say is that the coverage itself is what's illusory, AJC fails to tell us how this can be so when both parties agree that there is coverage for AJC's loss. Any argument along the lines of illusory coverage or an illusory coverage limit (whatever that might be) has been waived for failure to develop it on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

like here where an equipment breakdown results in loss of perishable goods. Furthermore, Triple-S argues that the Endorsement's Spoilage Coverage comes with its own $25,000 limit, which caps AJC's recovery at $25,000.[9]

## ii. Analysis

Now that we've laid out the applicable law, Policy provisions, and the parties' arguments, we can get to the bottom of this dispute.

Because neither party contends the Policy or its Mechanical Breakdown Exclusion is ambiguous, we will not go out of our way to find ambiguity. In the absence of claimed ambiguity, our job under Puerto Rico law is to simply apply the provisions as written. We begin, as we must, with the plain language.

### 1. Policy Language

As noted, the parties agree on the essential facts: AJC's perishable goods spoiled while in Economy's care, resulting in financial loss to AJC. They agree the spoilage resulted from a mechanical breakdown of Economy's freezers, and that AJC's goods, as Personal Property of Others, fall under the Policy's definition of Covered Property.

Turning to the Policy itself, we see that Triple-S agreed it would "pay for direct physical loss of or damage to Covered

---

[9] Triple-S raises a few other arguments, but we do not need to reach them to decide this appeal.

-15-

Property . . . caused by or resulting from any Covered Cause of Loss." Policy, Building and Personal Property Coverage Form, § A. This type of policy, "called, in insurance lingo, an 'all risks policy' -- covers all physical loss to the [specified] property unless 'caused by or resulting from' an excluded peril." Stor/Gard, 717 F.3d at 244. The Equipment Breakdown Exclusion then precludes coverage for losses caused by or resulting from the peril of mechanical breakdown. Policy, Causes of Loss - Special Form, § B.(2)(6).

Significantly, though, the Policy is individualized so as to contain the Equipment Breakdown Endorsement, which adds "Equipment Breakdown Coverage" back to the Policy. Under this coverage, Triple-S agreed to pay for certain losses "caused by or resulting from an 'accident' to 'covered equipment.'" Policy, Equipment Breakdown Endorsement ("Endorsement") § A.(2). The Endorsement also explicitly adds coverage for a "loss of 'perishable goods' due to spoilage," id. at § A.(2)(c)(i), which is what we've been calling Spoilage Coverage.

In light of the agreed upon facts, it is clear from the Endorsement's plain language that Spoilage Coverage applies to AJC's loss. There is no dispute about this. The question is, just how much coverage is available? The Spoilage Coverage itself, setting forth its own Sublimit, suggests an answer: "The most we

will pay for loss or damage under this coverage is $25,000 unless otherwise shown in a Schedule." Id. at § A.(5)(c).[10]

AJC raises a couple of arguments as to why we should interpret the Policy and Equipment Breakdown Endorsement as providing $500,000 of coverage for its loss. Neither, we believe, has merit.

### 2. Deletion of the Mechanical Breakdown Exclusion

We start with AJC's contention that the Equipment Breakdown Endorsement "expressly deleted" the Mechanical Breakdown Exclusion altogether. AJC relies (almost exclusively) on our opinion in Fidelity Co-Operative Bank v. Nova Casualty Co., 726 F.3d 31 (1st Cir. 2013), to say that we have already decided language similar to that in the Endorsement deletes an exclusion.

Although AJC makes Fidelity the centerpiece of its argument, it is of no assistance. The long and short of it is that the policy and endorsement at issue there involved quite different language than appears in the Triple-S Policy. In Fidelity, an amendatory endorsement provided simply that certain "[e]xclusions are deleted." 726 F.3d at 37 (emphasis added). This clear text, we found, resulted in the deletion of the "entire exclusion" at issue there. Id. at 37 n.2.

---

[10] AJC does not argue that any Schedule applies to increase the $25,000 Spoilage Sublimit.

The contractual language here is not even close to what we had before us in _Fidelity_.  Most obviously, the Equipment Breakdown Endorsement does _not_ say that it deletes the Mechanical Breakdown Exclusion.  It provides instead that "[a]ll exclusions and limitations apply except" for those specifically designated, including the Mechanical Breakdown Exclusion.  And, per the plain language, the exceptions referred to are inapplicable only insofar as the reestablished additional coverage provided by the Endorsement is concerned.[11]  Far from deleting that Exclusion from the original Policy, the Equipment Breakdown Endorsement simply renders it inapplicable to _certain_ coverage situations, like when perishable goods spoil as a result of "an 'accident' to 'covered equipment.'"  _See_ Endorsement § A.(2).  In sum, _Fidelity_'s dissimilar contract language does not support AJC's proposition that the Equipment Breakdown Endorsement's language in Economy's policy deleted the Mechanical Breakdown Exclusion.

Having disposed of its _Fidelity_-based argument, AJC is left with the bald assertion that the Endorsement "expressly deleted the [M]echanical [B]reakdown [E]xclusion."  Appellant Br. at 18.  Beyond citing to _Fidelity_, AJC does not explain how the Endorsement does so.  Since nowhere does the Endorsement state that

---

[11] Further, use of the word "apply" presupposes the continuing existence of the Mechanical Breakdown Exclusion.  After all, it would be nonsensical to say that something which no longer exists in the world (having been deleted) does or does not apply in a particular situation.

it deletes the Exclusion, this omission is practically enough on its own to doom AJC's position. And what's more, we find that AJC's take doesn't jibe with the Policy's overall structure or plain language.

First, by setting forth new "Additional Coverages" previously unknown to the Policy (including Spoilage Coverage), the Endorsement acts as a sort of "mini-policy." Like the Policy itself, the Endorsement sets forth an insuring agreement complete with its own definitions, detailed conditions, and deductible. The Endorsement even has something to say about exclusions. As we have seen, it specifies that certain existing exclusions do not apply to the Endorsement's coverage, it modifies other exclusions, and it adds still others that are only applicable to the Endorsement's brand of Equipment Breakdown Coverage.[12] Against this backdrop, it is clear that the Equipment Breakdown Endorsement is meant to do much more than simply delete an exclusion.

Furthermore, and perhaps most telling of all, the Endorsement does explicitly delete a portion of one of the original

---

[12] For example, the Endorsement excludes things like foundations, cabinets, insulating material, sewer pipes, water pipes, excavation or construction equipment, and equipment mounted on a vehicle from its definition of "covered equipment." Endorsement § B.(3)(a). And among other causes of loss, it excludes coverage for loss or damage caused by or resulting from "a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel," along with loss caused by or resulting from "an insulation breakdown test of any type of electrical equipment." Id. at § B.(3)(b)(iii).

exclusions in certain situations.  And -- unlike the policy we construed in <u>Fidelity</u> -- the Endorsement explicitly limits the effect of that deletion to coverage under the Endorsement itself. Specifically, the Endorsement states that

> [i]f the Causes of Loss-- Special Form applies, as respects this endorsement only, the last paragraph of Exclusion B.2.d.[13] <u>is deleted</u> and replaced with the following:  But if loss or damage by an "accident" results, we will pay for that resulting loss or damage.

Endorsement § B.(2)(c) (emphasis added).[14]  Had Triple-S intended to delete the Mechanical Breakdown Exclusion, surely it would have used the word "delete" to say so.  Instead, it made the Mechanical Breakdown Exclusion inapplicable solely to the Endorsement's coverage.  That Triple-S chose not to use simple language deleting the Mechanical Breakdown Exclusion, when it obviously knew how to do so, further demonstrates that the Equipment Breakdown Endorsement did not delete the Exclusion from the Policy.

---

[13] The referenced paragraph appears immediately after seven specific exclusions (including the Mechanical Breakdown Exclusion) in the original Policy and states, "[b]ut if loss or damage by the 'specified causes of loss' or building glass breakage results, we will pay for that resulting loss or damage."  Causes of Loss - Special Form, § B.(2)(d).  "Specified Causes of Loss," in turn, is itself defined in the Endorsement as "[f]ire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."  <u>Id.</u> at § F.

[14] Although each party set forth this particular policy language in its brief, neither makes any argument based upon it.

In essence, AJC's position that the Endorsement deleted the Exclusion effectively asks us to redraft the Policy's clear and unambiguous language. Accepting this invitation would contravene the well-established tenets of Puerto Rico's insurance law requiring us to interpret and apply unambiguous provisions of an insurance contract as they are written. We, therefore, reject AJC's argument that the Equipment Breakdown Endorsement deletes the Mechanical Breakdown Exclusion.

Let's take stock of what this means for coverage. The Mechanical Breakdown Exclusion continues to exist in the Policy. And the only coverage to which the Exclusion does not apply is that additional coverage set forth in the Equipment Breakdown Endorsement. So, coverage for AJC's loss must flow from that Endorsement because any potential alternative source of coverage falls prey to the Mechanical Breakdown Exclusion. Thus, the only coverage available for AJC's loss is provided by the Spoilage Coverage, as set forth in the Equipment Breakdown Endorsement.

### 3.  $25,000 Spoilage Coverage Limit

This brings us to AJC's final argument.

As we mentioned, the Endorsement's Spoilage Coverage comes with its own $25,000 Spoilage Sublimit. <u>See</u> Endorsement § A.(2)(c) ("The most we will pay for loss or damage under this coverage is $25,000 unless otherwise shown in a Schedule."). Although it is not particularly clear from its brief (or oral

-21-

argument), AJC seems to be arguing that even if coverage for its loss is found in the Endorsement's Spoilage Coverage rather than the main Policy, the $500,000 coverage limit in the Declarations nevertheless prevails over the lower Spoilage Sublimit. This is because, in AJC's view, the Sublimit applies only to spoilage of goods owned by the Named Insured, Economy, and not goods owned by Economy's clients. AJC asserts that, since the $25,000 Spoilage Sublimit does not apply to its loss, the $500,000 limit set forth in the Declarations becomes available to it.[15] Triple-S, however, tells us that the Spoilage Sublimit applies to Economy's loss of perishable goods no matter who owns those goods.

To unravel this question, we return to the Endorsement's language. The relevant part of the Spoilage Coverage provision states the following: "We will pay for your loss of 'perishable goods' due to spoilage." Recall that "you" and "your" refer only to the Named Insured, Economy. Thus, what this provision says is that Triple-S will pay up to $25,000 for "Economy's loss of 'perishable goods' due to spoilage." Since AJC's goods spoiled while in Economy's freezers, this $25,000 Sublimit kicks in to limit AJC's recovery.

---

[15] AJC does not, however, explain why this might be so where the only coverage for spoilage is by way of the Mechanical Breakdown Endorsement, not from the main Policy itself. This turns out to be academic anyway, given our ultimate conclusion.

-22-

Attempting to get out from under the Spoilage Sublimit, AJC urges us to add a "your" to the sentence and read it to say that Triple-S will only pay for "Economy's loss of Economy's 'perishable goods' due to spoilage."  This interpretation simply cannot be squared with the Endorsement's plain and unambiguous language.

According to its terms, the $25,000 Sublimit comes into play where Economy is responsible for the spoilage of perishable goods, regardless of who owns them.  This comes as no surprise. Economy's business, after all, is storing other companies' perishable goods.  So it makes sense that Economy would seek to obtain insurance coverage for those goods.[16]  This commercially-sensible rationale, along with the explicit Policy language employed by the contracting parties (Economy and Triple-S), work hand-in-hand to convince us that it would be unreasonable for us to read an extra "your" into the Spoilage Coverage.  In the absence of any ambiguity in the Policy language, Puerto Rico law calls for us to apply the Endorsement and its $25,000 Spoilage Sublimit as

_____

[16] We note that when the Puerto Rico Supreme Court considers an insurance policy in its entirety, as we do here, it does not hesitate to "take into account certain extrinsic elements that may shed light on the intention of the parties." Soc. de Gananciales v. Serrano, 145 P.R. Dec. 394, 400 (1998).  "These elements may vary according to the circumstances of each particular case, but they generally are:  the parties' contracting intention, the premium agreed on, the circumstances surrounding the negotiation and the contract, and the practices and customs established by the insurance industry." Id. at 401.  We, too, feel free to consider these factors as necessary.

written. We may not judicially redraft the Policy to reflect AJC's wishes.

Here, it is uncontested that AJC suffered a loss to its perishable goods as a result of Economy's malfunctioning freezers. We have already determined that coverage for this loss is provided by the Spoilage Coverage set forth in the Equipment Breakdown Endorsement. Thus, pursuant to the clear terms of the Spoilage Sublimit, the most that Triple-S is required to pay out due to this loss is $25,000. Any other conclusion would be contrary to the Endorsement's plain language and run afoul of basic precepts of Puerto Rico insurance law. We, therefore, apply the Endorsement and Spoilage Sublimit as written, and we conclude that the most AJC may recover for Economy's loss of AJC's perishable goods is $25,000.[17]

---

[17] One last note: AJC's brief includes an allegation that Triple-S "has admitted that the coverage under Personal Property of Others and its Limit of $500,000.00 is available for damage caused by an equipment breakdown." Appellant Br. at 22. Although AJC cites the addendum to its brief to support this statement, see id., AJC waited until its reply brief to explain that this admission comes from the parties' proposed pretrial stipulations of fact, see Appellant Reply at 8 n.2. Assuming an argument along these lines hasn't been waived, United States v. Arroyo-Blas, 783 F.3d 361, 366 n.5 (1st Cir. 2015) (recognizing that we need not address arguments that a party saves for its reply brief), and that it is appropriate for us to consider materials submitted in an addendum to a party's brief but not the joint appendix, see Appellee Br. at 4 n.1 (pointing this out), it is unavailing.

The proposed stipulation states, "Triple-S admits that the coverage under Personal Property of Others and its Limit of $500,000.00 is available for damage caused by an equipment breakdown." Recall that the Equipment Breakdown Endorsement provides more than just Spoilage Coverage. See, e.g., Endorsement,

## III. CONCLUSION

For the foregoing reasons, the district court's judgment is **affirmed**.

---

§ A.(1)(a) (providing coverage for a mechanical breakdown of covered equipment). Because we hold that coverage for AJC's loss is found solely by way of the Endorsement's Spoilage Coverage, the door remains open to the possibility that claims falling under different coverage provisions in the Endorsement could be covered up to $500,000. There is simply nothing inconsistent between the Triple-S admission and our holding today.