# United States Court of Appeals
## For the First Circuit

No. 15-2138

NILDA ESTHER LIND-HERNÁNDEZ; JOEL LIND-HERNÁNDEZ,

Plaintiffs,

v.

HOSPITAL EPISCOPAL SAN LUCAS GUAYAMA, a/k/a Hospital Episcopal
Cristo Redentor; DR. PEDRO RAMOS-CANSECO; DR. ALBERT MATOS; DR.
RUBEN ANTONIO PÉREZ-RAMIREZ; DR. JOSE ALFREDO CEBOLLERO-
MARCUCCI; ADMIRAL INSURANCE COMPANY, as insurer of Hospital
Episcopal San Lucas Guayama; CONJUGAL PARTNERSHIP RAMOS-DOE;
JOHN DOE; CORPORATION X, Y & Z; CONJUGAL PARTNERSHIP MATOS-DOE;
CONJUGAL PARTNERSHIP PEREZ-DOE; CONJUGAL PARTNERSHIP CEBOLLERO-
DOE,

Defendants.

DR. GERSON JIMÉNEZ-CASTANER, as Medical Director of Hospital
Episcopal San Lucas Guayama,

Defendant/Third-Party Plaintiff - Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY,

Third-Party Defendant - Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, <u>Chief Judge</u>,
Thompson and Barron, <u>Circuit Judges</u>.

_____

    <u>Juan M. Martínez Nevárez</u>, with whom <u>González & Martínez, PSC</u> was on brief, for appellant.
    <u>Eric Pérez-Ochoa</u>, with whom <u>Adsuar Muñiz Goyco Seda & Pérez-Ochoa, P.S.C.</u> was on brief, for appellee.

_____

August 2, 2018

_____

**BARRON**, **Circuit Judge**. This appeal concerns the dismissal of a suit that Dr. Gerson Jiménez-Castaner ("Jiménez") brought against Liberty Mutual Insurance Company ("Liberty"). Jiménez alleges that Liberty breached his contractual rights by wrongfully denying his request for coverage under the Directors and Officers ("D&O") insurance policy that Liberty had issued to a hospital in Puerto Rico where Jiménez served as the medical director.[1] The District Court granted Liberty's summary judgment motion on the ground that, under the policy, the "Claim" that would give rise to the "Loss" for which Jiménez sought coverage should be deemed to have been "first made" before the policy at issue took effect and thus was not covered by that policy. We now vacate the grant of summary judgment.

## I.

Jiménez filed his suit for breach of contract under Puerto Rico law against Liberty in the United States District Court for the District of Puerto Rico in August of 2013. On appeal, the core of the parties' dispute concerns the legal significance, if any, of two amended complaints that had been filed in a related lawsuit. An understanding of the parties' dispute, therefore,

---

[1] A D&O policy generally "exist[s] to fund indemnification covenants that protect corporate directors and officers from personal liability." Med. Mut. Ins. Co. of Me. v. Indian Harbor Ins. Co., 583 F.3d 57, 59 (1st Cir. 2009).

first requires that we provide a brief description of certain undisputed facts concerning that suit. And so we begin there.

On March 21, 2011, Lind Hernández and his sister, Nilda Ester Hernández, (the "Hernándezes") filed a lawsuit in the United States District Court for the District of Puerto Rico against a Puerto Rico hospital and several of its employees. That hospital is Hospital Episcopal San Lucas Guayama, which is also known as Hospital Episcopal Cristo Redentor ("Hospital").

On the same day that the Hernándezes filed their original complaint in their suit, they also amended their complaint. In that first amended complaint, they claimed that, while Lind Hernández was a patient at the Hospital, the negligence of the Hospital and certain of its employees led to the amputation of both of his legs and entitled the Hernándezes to, among other damages, compensation for physical and emotional injuries. The Hospital was served with the Hernándezes' first amended complaint on June 24, 2011.

During the time period in which the events alleged in the Hernándezes' first amended complaint occurred, Jiménez was serving as the medical director of the Hospital. He was not, however, named as a defendant in either the Hernándezes' original complaint or their first amended complaint. Nor was any other director or officer of the Hospital. Moreover, the Hernándezes'

- 4 -

first amended complaint was "devoid of any allegations of wrongful acts" against such persons or Jiménez.

The next event that is relevant to this appeal occurred on February 28, 2012. That day, the Hernándezes, in connection with their lawsuit, deposed Jiménez and questioned him "extensively about his supervisory and managerial duties as the Hospital's medical director, as well as the Hospital's bylaws and other purely administrative matters."

After the deposition, but on the same day, Jiménez conferred with the legal counsel for the Hospital. The two of them concluded that the Hernándezes might either file a new lawsuit, or amend their complaint in their existing suit, to bring claims against Jiménez in his capacity as the medical director of the Hospital. Accordingly, that same day -- February 28, 2012 -- the legal counsel for the Hospital forwarded a copy of the Hernándezes' first amended complaint to the Hospital's insurance broker. The insurance broker, also that same day, then forwarded the Hernándezes first amended complaint to Liberty, on behalf of "the insured," and requested that it be "process[ed] under the

[Hospital's November 2011 to November 2012 D&O] policy and any other issued policy that might apply."[2]

At that time, Liberty had issued the Hospital a D&O policy with a policy period that ran from November 30, 2011 through November 30, 2012.[3] Subject to certain exclusions, this policy obligated Liberty to provide coverage for "all Loss," including damages, that various "Insured[s]" became legally obligated to pay as a result of certain types of "Claim[s]" brought in a civil lawsuit against them. Among the "Insured[s]" the policy covered was the Hospital's medical "director[]."

Significantly, this policy is a "claims made" policy, which is a type of policy that typically "covers acts and omissions occurring either before or during the policy term, provided the claim is discovered and reported to the insurer during the same policy term." See DiLuglio v. New Eng. Ins. Co., 959 F.2d 355,

---

[2] Notably, the email forwarding the first amended complaint to Liberty does not expressly mention Jiménez, and in one place describes the "insured" as the Hospital's parent organization.

[3] Jiménez also asserts that there are three additional related D&O policies that Liberty issued to the Hospital. According to Jiménez, Liberty first issued the Hospital a D&O policy with a coverage period from on or about November 30, 2008 through November 30, 2009. He contends that there were then two renewals of that original policy -- one with a policy period of November 30, 2009 to November 30, 2010, and another with a policy period of November 30, 2010 to November 30, 2011 -- which issued prior to the November 30, 2011 to November 30, 2012 policy at issue. Of the alleged prior policies, only the 2010-2011 policy is included in the record in this appeal.

358 (1st Cir. 1992) (emphasis omitted).[4]  This type of policy, we have explained, is premised on the notion that, "[a]s it is often difficult to ascertain the precise date of the act or omission which constituted the alleged [wrongful act] on the part of the insured, . . . the pivotal event for insurance coverage purposes becomes the date the claim is made against the insured, rather than the date of the act or omission forming the basis for the claim."  Id. (internal citation and alternations omitted).

The policy thus contained the following important qualifications regarding when "Insureds" must notify Liberty of any "Claim" made against them.  The policy provided that any such "Claim" for which an "Insured" sought coverage must not be "first made" prior to the start of the policy period for that policy.  The policy further provided that a "Claim will be deemed first made on the date an Insured receives a written . . . complaint."  Finally, the policy provided that a "Claim" must be reported to Liberty "as soon as practicable but in no event later than 60 days after the end of the Policy Period or [the twelve-month] Discovery Period, if applicable."

---

[4] "By contrast, 'occurrence policies' cover insured events that occur during the policy period," and "the insured event is the occurrence, not the claim."  Edwards v. Lexington Ins. Co., 507 F.3d 35, 38 n.2 (1st Cir. 2007).

Liberty denied the insurance broker's request for coverage under the D&O policy on March 26, 2012. Liberty explained that it was doing so for three reasons. First, Liberty cited what it termed "the late notice" to Liberty of the first amended complaint in the Hernándezes' lawsuit.[5] Second, Liberty cited an endorsement in the policy that excluded medical malpractice claims from being covered. And, third, Liberty stated that the damages sought by the Hernándezes in the first amended complaint related to a loss for which there is no coverage under the policy.[6]

There is one more sequence of events that relates to the issues presented in Jiménez's appeal of the District Court ruling dismissing his suit against Liberty. This sequence begins almost a month after Liberty had informed the insurance broker that it was denying the request for coverage of "all Loss" resulting from the Hernándezes' first amended complaint.

Specifically, on April 23, 2012, the Hernándezes filed a second amended complaint in their lawsuit. This complaint, for

---

[5] That complaint, as we have noted, had been received by the Hospital on June 24, 2011. Thus, it appears that Liberty considered that "Claim" to have been "first made" prior to the start of the policy period for the November 2011 to November 2012 policy and to have been reported too late to comply with the reporting requirements of any earlier D&O policy that Liberty had issued to the Hospital.

[6] It is unclear from the record as it comes to us if the denial of coverage was as to a claim by Jiménez only, a claim by the Hospital, or both.

the first time, named Jiménez, as a co-defendant in the Hernándezes' lawsuit. In doing so, the second amended complaint alleged negligence by Jiménez in violation of Puerto Rico law due to his conduct as the medical director of the Hospital. Jiménez was served with the Hernándezes' second amended complaint on May 3, 2012.

On June 19, 2012, the insurance broker sent a copy of the Hernándezes' second amended complaint to Liberty with a request for coverage concerning the allegations against Jiménez as the medical director of the Hospital.[7] That same day, Liberty reiterated to the insurance broker that Liberty was denying coverage. Liberty also thereafter denied a request by the broker for reconsideration.

Jiménez then filed, on August 21, 2013, this lawsuit against Liberty in federal court. In the suit, he alleges that Liberty breached the Hospital's 2011-2012 D&O policy by denying him the requested coverage for the "Loss" that he would incur as a result of the "Claim" made against him by the Hernándezes' in their second amended complaint, and he seeks a declaratory judgment

---

[7] On October 24, 2012, the Hernándezes filed a third amended complaint simply to include Admiral Insurance Company as a co-defendant. As the third amended complaint is coextensive with the second amended complaint in relevant respects, we need not discuss it separately.

that he "should be afforded coverage under the insurance agreement," monetary damages, and attorney' fees.

Jiménez's lawsuit was consolidated with the Hernándezes suit. Liberty then filed a motion for summary judgment as to Jiménez's claims alleging that Liberty had breached the terms of the D&O policy, and the District Court granted that motion. Jiménez subsequently filed a motion for reconsideration and a motion to set aside the judgment, both of which the District Court denied.

Jiménez now appeals the District Court's order granting Liberty's summary judgment motion.[8] Our review is de novo. See Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018). "We may decide in favor of the moving party -- here, [Liberty] -- 'only if the record

---

[8] The District Court issued a judgment with respect to its summary judgment ruling on May 4, 2015. Jiménez then timely filed both a motion for reconsideration and a motion to set aside the judgment, which tolled the time to take an appeal from the judgment. See Fed. R. App. P. 4(a)(4). After the District Court issued an order denying both motions on August 20, 2015, Jiménez timely filed a notice of appeal of the summary judgment ruling. Jiménez's notice of appeal, however, did not mention an appeal of the order denying Jiménez's motion for reconsideration and his motion to set aside the judgment. On appeal, Liberty asserts we thus lack jurisdiction to review the District Court's ruling as to those motions. As Jiménez timely appealed the summary judgment ruling -- a conclusion Liberty does not dispute -- which we now vacate without reaching the later-filed motions, mootness obviates the need to address the parties' jurisdictional arguments concerning those later-filed motions because those motions concern only additional arguments for finding the District Court erred in arriving at the conclusion that provides the basis for the summary judgment ruling that we now vacate.

reveals that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 22 (1st Cir. 2015) (quoting Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011)). Moreover, we note that "[t]he construction of an insurance policy is a question of law, and the legal conclusions of the district court are, of course, not binding on the court of appeals." Nieves v. Intercontinental Life Ins. Co. of P.R., 964 F.2d 60, 63 (1st Cir. 1992), as amended (May 18, 1992). We, therefore, "may make an independent examination of [the] insurance policy." Id.

## II.

We first provide a description of the law that guides our construction of the D&O policy issued by Liberty. We then describe the policy's relevant provisions. With that background in place, we then explain why we agree with Jiménez's argument that the District Court wrongly construed the policy in concluding that Liberty did not breach it by denying Jiménez coverage for the "Loss" that he would incur in consequence of the "Claim" that the Hernándezes brought against him in their second amended complaint.

## A.

As this is a diversity case, see 28 U.S.C. § 1332(c), the law of Puerto Rico supplies the substantive rules of decision concerning the interpretation of the insurance policy at issue. See López & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64 (1st

Cir. 2012).  Under Puerto Rico law, we first turn to the Insurance Code of Puerto Rico, P.R. Laws Ann. tit. 26 ("Insurance Code"), to obtain guidance as to how we should interpret the insurance contract.  See Nieves, 964 F.2d at 63.

Pursuant to the Insurance Code, every insurance contract "shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached and made a part of the policy."  P.R. Laws Ann. tit. 26, § 1125.  The Puerto Rico Civil Code ("Civil Code"), however, may provide a supplemental source of law if the Insurance Code fails to provide an interpretive approach for a given situation.  See López & Medina Corp., 667 F.3d at 64.

Because insurance contracts are generally viewed as contracts of adhesion under Puerto Rico law, ambiguous insurance policy language must be liberally construed in favor of the insured.  See AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 4 (1st Cir. 2015) (quoting Pagán Caraballo v. Silva Delgado, 22 P.R. Offic. Trans. 96, 101 (1988)).  As provided in the Civil Code, however, when "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."  P.R. Laws Ann. tit. 26, § 3471.

Finally, we note that, under Puerto Rico law, exclusions in insurance policies are disfavored and "should be strictly construed and in such a way that the policy's purpose of protecting the insured is met."  AJC Int'l, Inc., 790 F.3d at 4 (quoting Pagán Caraballo, 22 P.R. Offic. Trans. at 101).  But, when the meaning and scope of a policy term or clause favoring the insurer is clear and unambiguous, the unambiguous term is binding on the insured, even if it eliminates coverage.  See id.

**B.**

The specific policy issued by Liberty to the Hospital at the center of the parties' dispute on appeal appears to be Executive Advantage Policy VKU-1000883-11.[9]  By its terms, the "Policy Period" for that policy is defined as November 30, 2011 to November 30, 2012.

The policy provides coverage to two types of "Insureds." One type of "Insured" is an "Insured Person[]," a term which is defined in section 25.10 of the policy, as modified by Endorsement No. 1 to the policy.  That type of "Insured" includes the Hospital's "duly elected, appointed or hired directors or

---

[9] The contract forming the policy at issue is actually comprised of four parts -- the policy application, a policy declarations page, the policy, and attached endorsements (collectively, the "policy").  As the parties have not provided the policy application to us on appeal, nor made any arguments with respect to such application, we understand them to be conceding that the policy application is irrelevant to our analysis.

officers." Thus, as we have noted (and as the parties do not dispute), Jiménez is within the definition of this term by virtue of his position as the medical director of the Hospital. The other type of "Insured" is an "Insured Organization," a term which is defined in section 25.9 of the policy, as modified by Endorsement No. 17 to the policy. That type of "Insured" exclusively includes "Iglesia Episcopal Puertorriqueña" and "any Subsidiary," including twelve listed organizations of which one is the Hospital.

The coverage provided to each type of "Insured" -- subject, that is, to certain exclusions set forth elsewhere in the policy -- is spelled out in section 1 of the policy, which establishes Liberty's obligation to pay for an "Insured['s]" "Loss" in three distinct "Insuring Agreements." Those agreements are denominated in section 1 as "Insuring Agreements 1.1," "Insuring Agreement 1.2," and "Insuring Agreement 1.3." Only two of these insuring agreements, Insuring Agreement 1.1 and Insuring Agreement 1.3, are relevant here.

Insuring Agreement 1.1, by its plain terms, establishes Liberty's obligation to pay for "all Loss" for a "Claim" that is made "against" "Insured Persons." By contrast, Insuring Agreement 1.3, as amended by Endorsement No. 1 to the policy, establishes Liberty's obligation to pay for "all Loss" that results from a "Claim" that is made against an "Insured Organization." Each of the insuring agreements that is relevant here -- Insuring Agreement

- 14 -

1.1 and 1.3, respectively -- further specifies Liberty's obligations to the relevant type of insured to which each of these insuring agreement applies. In particular, in each of these insuring agreements, Liberty commits to pay "all Loss" that the relevant type of insured "shall become legally obligated to pay as a result of a Claim first made during the Policy Period . . . against the" insured insofar as that "Claim" is "against the" insured "for a Wrongful Act which takes place before or during the Policy Period."

Thus, the terms "Loss" and "Claim" are also critical to the operation of the insuring agreements at issue, as are the words "first made during the Policy Period" and "Wrongful Act." Helpfully, the policy expressly addresses the meaning of each of these terms. And so, before turning to Jiménez's grounds for challenging the District Court's dismissal of his suit, we first briefly review how the policy does so, as the meaning of each of these terms also figures in our analysis.

The term "Loss" is defined in section 25.12 of the policy as amended by Endorsement No. 1 to the policy. That definition, in relevant part, defines "Loss" to mean:

> [S]ums which the Insured Persons, or with respect to Insuring Agreement 1.3, the Insured Organization are legally obligated to pay solely as a result of any Claim insured by this Policy including Defense Costs, damages, front pay . . . and back pay, judgments, settlement amounts, legal fees and costs awarded

pursuant to judgments, punitive, multiplied or exemplary damages, where insurable by law.

The term "Claim" is defined in section 25.3 of the policy, as modified by Endorsement No. 1 to the policy. That definition states, in relevant part, that a "Claim" is "a civil or criminal proceeding or arbitration against an Insured Person, or with respect to Insuring Agreement 1.3, against the Insured Organization."

The policy's definition of "Claim" also makes clear how one goes about determining the time at which such a "Claim" has been "first made." Specifically, the definition of "Claim" states, in relevant part, that "[a] Claim will be deemed first made on the date an Insured receives a written . . . complaint."

Finally, the term "Wrongful Act" is defined by section 25.20 of the policy. That provision defines the term to include:

> (a) any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, actually or alleged [sic] committed or attempted by the Insured Persons in their capacities as such . . . or, with respect to Insuring Agreement 1.3, by the Insured Organization; or (b) any matter claimed against the Insured Persons solely by reason of their status as Insured Persons.

## c.

With these features of the D&O policy in mind, we now turn to the parties' primary dispute. It concerns when the "Claim" that triggers the "Loss" for which Jiménez seeks coverage from Liberty under the policy should be "deemed first made."

- 16 -

Jiménez contends that he is seeking to have Liberty pay for "all Loss" that he would become legally obligated to pay solely in consequence of the "Claim" that is represented by the allegations set forth in the Hernándezes' second amended complaint, given that he was not named in their first amended complaint.  And, he points out, there is no dispute either that the Hernándezes' second amended complaint was first received by an "Insured" -- namely, himself -- when he was served with it, or that such service occurred within the "Policy Period."  Thus, Jiménez argues, the "Claim" giving rise to the "Loss" for which he seeks coverage from Liberty was a "Claim" that was "first made" as of the time that he received the Hernándezes' second amended complaint, and not, as Liberty contends, as of the time that the Hospital received the Hernándezes' first amended complaint, which was before the "Policy Period" for the 2011-2012 policy began, as that first amended complaint was not made "against" him.

In consequence of the plain text of the policy, we agree with Jiménez.[10]  To explain why, it helps to clear away some key points at the outset of our analysis.  These key points bring into

---

[10] As we conclude that the Hernándezes' second amended complaint is a "Claim" that was "first made" within the "Policy Period" of the policy at issue, we have no need to consider Jiménez's arguments concerning the policy's "Prior Litigation Dates" or the existence of, and any coverage liability that Liberty may have pursuant to, prior D&O policies issued by Liberty to the Hospital.

focus the conclusion that the "Claim" brought against the Hospital for the purposes of Insuring Agreement 1.3 is distinct from and does not merge with the "Claim" against Jiménez for the purposes of Insuring Agreement 1.1 during the "Policy Period," whether one focuses on the definition of "Claim" set forth in section 25.3, or the language in section 9, which concerns Liberty's limit of liability with respect to any "Loss" that an "Insured" suffers.

First, the plain text of the policy makes clear that, to the extent that Liberty is obligated to pay for "all Loss" that Jiménez, as an "Insured Person," becomes legally obligated to pay as a result of a "Claim," such an obligation derives solely from Insuring Agreement 1.1 and not from Insuring Agreement 1.3.[11] Jiménez, after all, is an "Insured Person" and not an "Insured Organization." And it is Insuring Agreement 1.1 that establishes Liberty's obligation to pay for "all Loss" resulting from a "Claim" made "against" an "Insured Person;" Insuring Agreement 1.3 establishes, only, Liberty's obligation to pay for "all Loss" resulting from a "Claim" that is made "against" an "Insured Organization."

Second, the Hernándezes' second amended complaint, in and of itself, is a "Claim . . . against the Insured Person[]" -- i.e., Jiménez -- within the meaning of Insuring Agreement 1.1.

_____

[11] As previously noted, Insuring Agreement 1.2 is not relevant to this case.

- 18 -

That is clear from the plain text of the definitions of the words "Claim" and "Insured Person."

Third, the Hernández' second amended complaint was received by an "Insured Person" at least by May 3, 2012, when Jiménez was served with it. And that fact is significant because that date is within the "Policy Period."

These three conclusions -- none of which are controversial or even contested -- are, in combination, quite important, even though they are not in and of themselves dispositive. In consequence of them, we need to answer only one question in order to decide whether Jiménez is right about when the "Claim" that gives rise to the "Loss" that he seeks to make Liberty cover should be "deemed first made." And that question is the following: Is there any "Claim" that could qualify as a "Claim . . . against the Insured Person[]" for purposes of Insuring Agreement 1.1 other than the one that is represented by the Hernández' second amended complaint? For, if there is no other "Claim" that could so qualify, then the "Claim" that would result in the "Loss" for which Jiménez seeks to make Liberty pay under the policy is necessarily the "Claim" that is represented by the Hernández' second amended complaint and thus a "Claim" that should be "deemed first made" during the "Policy Period."

Liberty contends that there is another "Claim" that does so qualify -- namely, the one that is premised on the Hernández'

first amended complaint.  And because the Hospital -- which is "an Insured" -- received that complaint before the "Policy Period," Liberty argues that Jiménez is seeking to make Liberty pay for a "Loss" that results from a "Claim" that should be "deemed first made" before the "Policy Period" began.  But, given the plain terms of the policy, this argument lacks merit.

To be sure, the text of the D&O policy -- by virtue of the definition of "Claim" in section 25.3 -- makes clear that the Hernándezes' first amended complaint is a "Claim."  The text of the policy -- by virtue of the definition of "Insured[]" in section 25.8 -- also makes clear that the "Claim" represented by that first amended complaint was received by an "Insured" -- namely, the Hospital.  But, that "Claim" is clearly not a "Claim" within the meaning of Insuring Agreement 1.1, as it is not a "Claim" that is made "against an Insured Person."  After all, that "Claim" did not name any "Insured Person."  Thus, the Hernándezes' first amended complaint cannot establish the date on which the "Claim . . . against the Insured Person[]" that results in the "Loss" for which Jiménez seeks coverage under Insuring Agreement 1.1 should be "deemed first made."

Undeterred by the clear text of the policy on this crucial point, Liberty nevertheless argues otherwise.  To do so, Liberty asks us to focus not on the text of Insuring Agreement

1.1, but instead on one of the subsections in the "Limit of Liability" section of the policy -- section 9.2, to be exact.

That subsection states that "[a]ll Claims arising from the same Wrongful Act or Interrelated Wrongful Acts shall be deemed one Claim and subject to a single limit of liability." That subsection then further states that "[s]uch Claim shall be deemed first made on the date the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period." Moreover, the definition of the term "Interrelated Wrongful Acts," which is set forth in section 25.11 of the policy, makes clear that the term encompasses any "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, or causes."

Against this background, Liberty argues that the allegations in the Hernándezes' first amended complaint and in their second amended complaint "arise[] . . . from the same . . . Interrelated Wrongful Acts." As a result, Liberty contends -- per the language in section 9.2 -- that these two "Claims" should be "deemed one Claim" and that "such Claim shall be deemed first made on the date the earliest of such Claims is first made," which would be June 24, 2011. After all, that is the date that the Hospital received the first amended complaint.

- 21 -

The problem with this argument, however, is a fundamental one. As we have explained, the policy establishes Liberty's obligation to pay for the "Loss" for which Jiménez seeks coverage not in section 9, but in Insuring Agreement 1.1. And, as we have seen, Liberty's obligation to pay for Jiménez's "Loss," to the extent that it exists, arises out of Insuring Agreement 1.1 alone. Section 9, by contrast, merely delineates, by cross-referencing the policy's declarations page, the most that Liberty would be obligated to pay to the "Insured(s)" for "all Loss" under the policy -- "$5,000,000 in any one Claim for the Policy Period and in the aggregate for the Policy Period."

To be sure, the Insurance Code does dictate that the policy "shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]" P.R. Ann. Laws tit. 26, § 1125. But, we do not see how the text of the policy permits us to import the language in section 9.2 that defines what constitutes "one Claim" into the term "Claim" as that term is used in Insuring Agreement 1.1.

The word "Claim" does appear in both section 9.2 and Insuring Agreement 1.1. But, that fact does not show that the meaning of this term is invariant throughout the policy. After all, although generally "[a]n expression to which a plain meaning is attached in one part of an instrument is held to have the same meaning in other parts of the same instrument," that presumption

readily yields when the words are employed in different ways that "plainly" reveal that they are being used differently in different parts of the policy.  2 Couch on Ins. § 22:42 (3d ed.).  And here, the policy is quite express in using the word "Claim" differently.

The requirement to aggregate "Interrelated Wrongful Acts" on which Liberty places such great weight appears only in section 9.2.  That requirement is conspicuously absent from either the general definition of "Claim" in section 25.3 or the text of Insuring Agreement 1.1 itself.[12]  Moreover, when section 9.2 states that "[s]uch Claim shall be deemed first made on the date that the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period" (emphasis added), the "such Claim" there referenced is clearly the "one Claim" that, per section 9.2's special instruction, has been aggregated.  And, section 9.2 makes clear that this aggregated "one Claim" is then "subject to a single limit of liability."

Thus, as this review shows, there is no text in section 9.2 that indicates that the reader of the policy must treat interrelated "Claims" as "one Claim" for any purpose other than

---

[12] And, as we have pointed out already, it is clear that "Insured Persons" and "Insured Organization[s]," respectively -- are distinct.  The text of the policy demonstrates this distinction in, for example, section 25.8 of the policy, which defines the general term "Insured(s)" to include first "Insured Persons" and then "solely with respect to Insuring Agreements 1.2 and 1.3, the Insured Organization." (Emphasis added).

for the purpose of determining the limit of Liberty's liability for a covered "Claim." Nor is there any text in that section that indicates that the reader must do so in determining the threshold question of whether, under Insuring Agreement 1.1, Liberty is obligated to pay "all Loss" resulting for a "Claim" made "against" an "Insured Person." And, as we have seen, there also is no text in Insuring Agreement 1.1 that so indicates. Thus, the special usage of "Claim" in the one portion of section 9.2 on which Liberty relies says nothing -- and, in context, certainly nothing clearly, see López & Medina Corp., 667 F.3d at 64 (explaining that ambiguous insurance policy language must be liberally construed in favor of the insured and maximizing coverage under Puerto Rico Law) -- about what a "Claim" is under Insuring Agreement 1.1.[13]

We thus reject Liberty's assertion that the "Claim" for which Jiménez seeks coverage from Liberty was "first made" prior to the beginning of the policy at issue. And because that is the only ground on which the District Court relied in dismissing Jiménez's claim, we reject its reasoning for granting Liberty's motion for summary judgment.

---

[13] For the same reasons, the "Claim" referenced in the part of section 25.3's definition that states that a "Claim" is "deemed first made" when it is received by "an Insured" is not an aggregated one. Rather, the "Claim" referenced in that sentence clearly refers to a "Claim" as just defined in that section, which is, as is relevant here, "a civil . . . proceeding . . . against an Insured Person."

**D.**

Liberty does argue, in the alternative, that we may affirm the District Court's summary judgment ruling for reasons that Liberty raised below but that the District Court did not reach in its ruling. In particular, Liberty argues that, even if the second amended complaint constituted a "Claim . . . first made" within the Policy Period, two exclusions in that policy make clear that the specific allegations against Jiménez in the second amended complaint are not covered by the D&O policy.

Liberty argues first that the exclusion at section 5.1 of the policy, which states, in relevant part, that Liberty "shall not be liable to make any payment for Loss in connection with any Claim: for bodily injury, sickness, diseases, death, emotional distress, [or] mental anguish," encompasses the "remedies and compensatory damages" that the Hernándezes seek in their second amended complaint. Jiménez, for his part, does not appear to dispute that certain of the damages sought by the Hernándezes may be characterized as claims for damages for "bodily injury, sickness, diseases, death, emotional distress, [or] mental anguish . . . ." But, Jiménez contends, at least some of the damages sought -- such as the compensation that he seeks for loss of enjoyment of life, loss of capacity to generate income, special medical treatment and equipment and lifetime care and support -- are not within the scope of the section 5.1 exclusion.

Liberty also argues that, even if the section 5.1 exclusion does not bar coverage, the "absolute medical malpractice" exclusion does. That exclusion states that Liberty is "not . . . liable for Loss . . . on account of any Claim made against any Insured based upon, or arising out of, attributable to or in any way involving, in whole or in part, the rendering [of], or failure to render, professional services in connection with the Insured's business as a provider of medical services." The exclusion goes on to define "professional services" as including:

> [W]ithout limitation: . . . providing medical, surgical, dental, psychiatric or nursing treatment, care, diagnosis or services, including the furnishing of food or beverage in connection therewith; . . . providing routine and/or esoteric testing services, including MRI, radiology and/or X Ray, used in the diagnosis, monitoring, and/or treatment of disease or any other medical condition; . . . furnishing or dispensing drugs or medical, dental or surgical supplies or appliances; . . . providing services as a member of or participant in a formal medical peer review committee, board or similar medical peer review group of the Insured Organization, hospital, or professional society; or . . . giving advice in connection with any of the above.

Jiménez responds by pointing out that there appear to be no allegations in the second amended complaint that Jiménez ever treated Lind Hernández or should have provided treatment to Lind Hernández. Instead, the allegations against Jiménez appear to relate only to his administrative duties as the medical director of the Hospital. As such, Jiménez contends that Liberty's argument that the "Claim" made against Jiménez via the Hernándezes' second

- 26 -

amended complaint is "based upon, or arising out of, attributable to or in any way involving, in whole or in part, the rendering [of], or failure to render, professional services in connection with the [Jiménez]'s business as a provider of medical services" lacks support. And thus he contends that Liberty is wrong to argue that this exclusion applies because "[t]he allegations asserted against . . . Jiménez are clearly based upon, arise out of, are attributable to, and involved, in almost exclusive part, the rendering or failure to render appropriate medical care or medical services to . . . Lind Hernández."

We may, in our discretion, affirm a ruling below on legal grounds not addressed by the District Court. See Am. Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 815 F.3d 43, 63 (1st Cir. 2016)(explaining that the Court of Appeals "may affirm [a summary judgment ruling] on any ground made manifest in the record, untethered to the district court's rationale"). And the debates over the scope of these exclusions concerns the proper construction of the scope of the insurance policy and thus arguably present pure questions of law.

But, in this case, we conclude that the prudent course is to leave it to the District Court to consider these thus far unaddressed arguments. That way the District Court may decide whether, in light of any relevant record facts, and the general

directive in Puerto Rico law to interpret the exclusionary clauses at issue narrowly, see AJC Int'l, Inc., 790 F.3d at 4 (quoting Pagán Caraballo, 22 P.R. Offic. Trans. at 101); Guerrido Garcia v. U.C.B., No. CE-94-448, 1997 WL 321101 (P.R. May 30, 1997) (explaining that under Puerto Rico law "exclusionary clauses must be restrictively construed so that the policy's purpose of protecting the insured is met"), these exclusions provide an independent basis for granting summary judgment to the defendants. Accordingly, we decline to address these issues in the first instance.

## III.

The District Court's entry of summary judgment is **vacated**, and we **remand** the case for further proceedings consistent with this opinion.  The parties shall bear their own costs.